**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **KIMBERLY R. WELCH,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | **Civil Action** |
| | **:** | **No. 5:05-cv-131(CAR)** |
| **v.** | **:** | |
| | **:** | |
| **MERCER UNIVERSITY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

In this lawsuit, Plaintiff alleges that she was denied a promotion and terminated because of her race, that she was denied equal pay because of her race, and that she experienced "disability discrimination" during her employment at the Mercer University School of Medicine. In its Motion for Summary Judgment (Doc. 28), Defendant has shown, by reference to the pleadings, deposition of the Plaintiff, affidavits of numerous parties, and documentary evidence on file, that there is no direct or circumstantial evidence of any intent to discriminate against Plaintiff either on account of her race or because of any real or perceived disability. In her response, Plaintiff has failed to produce or identify evidence sufficient to establish genuine issues of material fact with regard to her claims. Because there are no genuine issues of fact requiring resolution at trial, and because Defendant is entitled to judgment as a matter of law on the undisputed record in the case, the Motion for Summary Judgment is hereby **GRANTED**.

I.       **Summary Judgment Standard**

1

Plaintiff's discrimination claims ultimately fail because she has failed to produce evidence sufficient to support a finding of discriminatory intent in the adverse employment actions that she alleges. A defendant seeking summary judgment bears the initial burden of presenting and identifying evidence in the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits on file which demonstrate the absence of any genuine issue of material fact. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Supreme Court has explained that the moving defendant need not produce evidence to negate the plaintiff's claim, but need only show "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

On motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving plaintiff, and must draw all reasonable inferences from that evidence in favor of the plaintiff. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). Nevertheless, once a moving defendant has produced evidence to show the absence of a genuine issue of material fact, the plaintiff must "by affidavits or as otherwise provided in this rule . . . set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In Celotex, the Court held that summary judgment is appropriate when the plaintiff

> fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant

rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). Ultimately, the question for the Court is whether there is evidence on which a jury could reasonably find for the plaintiff. Burton, 178 F.3d at 1187.

## II.     Evidence in the Record

Proper review of this Motion has been complicated by the inadequacy of Plaintiff's response. Plaintiff's brief (Doc. 46) is poorly drafted, and it is difficult to discern the outline of her argument within its text. Plaintiff's evidentiary support for her claims is similarly lacking. Defendant, meanwhile, has submitted a substantial body of evidentiary materials to support its Motion, in the form of affidavits, documents, and the deposition of the Plaintiff. Its Statement of Material Facts [Doc. 30] provides detailed citations to the evidence in the record. Plaintiff in her Response has submitted only a copy of an October 25, 2004 police report, a copy of her separation notice, and copies of certification forms from her physician supporting her medical leave in 2003 and 2004. The relevance and admissibility of these documents is questionable. There are no affidavits accompanying these documents to provide a foundation for their admission or a context for their relevance. Plaintiff's Response to Defendant's Statement of Material Facts [Doc. 47] makes numerous assertions of fact but fails to provide citations by which the Court can identify the evidence to support those assertions.[1] The lack of citations has made evaluation of Plaintiff's factual contentions a frustrating undertaking; nevertheless, the Court has thoroughly reviewed all of the evidentiary materials on file with more than proper deference to the Plaintiff's contentions and

---

[1]The Court's Local Rule 25 requires that a party responding to a motion for summary judgment submit a separate and concise statement of material facts to which the respondent contends there is a genuine issue to be tried. The statement of facts must clearly identify any documents or other record materials, where possible providing dates, specific page numbers, and line numbers. Plaintiff's response fails to comply with this rule, and many of the documents to which her statement of facts refers are difficult to identify and do not appear to be in the record at all.

arguments. Based upon a review of this evidence, the Court finds that the following relevant facts are undisputed or are taken in the light most favorable to the Plaintiff.

At the beginning of 2003, Plaintiff was employed in the Division of Basic Medical Sciences in the School of Medicine at Mercer University ("the University"). Under the University's system of job classification, Plaintiff's position was classified as Research Coordinator III. Her annual salary was $34,144. Her supervisor was Dr. Brian Tobin, Professor of Nutrition and Biochemistry. Plaintiff began her employment with the University in 1993 as a Research Technician working for Dr. Tobin on animal studies for a diabetes research project. According to Plaintiff, her starting salary was $12,000. (Plaintiff's Dep., p. 82). Over the years she received various promotions, and in 2000 she was given the title of Research Coordinator and transferred to a long-term research project on Nutrition and Cardiovascular Disease ("NCVD") Prevention in Underserved Populations, funded by a grant from the National Institutes of Health. Under the NIH grant, the NCVD project was originally scheduled to conclude in 2004, but was extended an additional year, to conclude in 2005.

In early 2003, Plaintiff decided that she was entitled to a more elevated position and a higher salary. On January 17, 2003, Plaintiff submitted to the University's Human Resources Office a request for reclassification and Position Description Questionnaire ("PDQ") for the proposed new position of "Program Director/Instructor." Plaintiff's Dep. (Doc. 36), p. 127-28, Ex. 9. Dr. Tobin supported Plaintiff in her request and submitted a letter to the Human Resources Office requesting that Plaintiff "be reclassified as a Program Director, Instructor, with a commensurate salary of $45,514 effective February 1, 2003." Tobin Dec. (Doc. 28, Ex. 1), ¶ 24; Att. 2. Several days later,

on January 28, 2003, Dr. Tobin submitted a Grant Progress Report to the National Institutes of Health that listed Plaintiff as Program Director/Instructor with an annual salary of $45,514.

Although Dr. Tobin supported Plaintiff's request for reclassification and salary increase, he did not have the authority to grant the request himself. Academic supervisors or department heads were not authorized to assign salaries. That authority resided with the University's Human Resources Department, which was part of the Finance Office. The Finance Office was headed by Cheryl Reagan, the Assistant Dean of Administration and Finance Management. Within the Finance Office, Diane Baca was the Associate Vice President of Human Resources. The Human Resources Department determined salaries according to compensation policies that applied to employees within their separate job classifications. Mercer maintained three separate job classification systems: one for "classified" employees; one for professional administrative employees; and one for faculty. As Research Coordinator, Plaintiff was a professional administrative employee. The Program Director/Instructor position that she requested was a faculty position, as was the salary level she sought. Within Mercer's classification system there are four levels of faculty: Instructor; Assistant Professor; Associate Professor; and Professor. To be reclassified from a professional administrative position to a faculty position, an employee must secure the approval of the chair/director of the department in which she is employed. The department chair evaluates the employee's credentials based on the needs of the department and its faculty standards. In 2003 the chairman of the Basic Science department was Dr. Robert Moon. In a January 28, 2003 email, Sharon Hall from the Human Resources office directed Plaintiff to apply to Dr. Moon for appointment to a faculty position in the department. Plaintiff's Dep.(Doc. 36), Ex. 12, P-0186.

Dr. Moon did not approve Plaintiff's request for reclassification to a faculty position. Plaintiff met with Dr. Moon and Dr. Tobin shortly after receiving Ms. Hall's email. Dr. Moon informed Plaintiff that all faculty members in the Basic Science department were required to have Ph.D or M.D. degrees. Plaintiff's Dep., p. 129. At the time the department did not have any Instructor-level faculty members and was not seeking any Instructors. Moon Dec. (Doc. 34), ¶ 8, 11. It is undisputed that Plaintiff did not have a Ph.D. or M.D. Plaintiff had obtained a Masters in Public Health from Mercer in 2000 and was working towards a Ph.D. in Health Services by correspondence through Walden University in Minnesota. In an October 2004 memorandum supporting her charge of discrimination Plaintiff represented to the EEOC that she had completed her doctorate studies "all but dissertation" (Plaintiff's Dep. (Doc. 36), Ex. 1, P-0696), but she later admitted in her April 2006 deposition that she had only completed four of the seven required courses for the degree at the time of the memorandum and that at the time of the deposition she still had not completed a proposal for her dissertation. Id. at 256-59. She explained that this apparent misrepresentation was the result of her misunderstanding the meaning of the term "all but dissertation." Id.

Because Plaintiff was not approved for a faculty position in the department, the Human Resources office denied her request for reclassification to the position of "Program Director/Instructor." In an email dated April 11, 2003, Reagan notified Plaintiff that she had been approved for reclassification to the title "Project Director," without any increase in salary from her previous position as Research Coordinator. Plaintiff's Dep. Ex. 12, P-0203. For the fiscal year 2003-2004, the University had implemented a University-wide freeze on salary increases. Salaries were increased only as a result of position changes. Reagan and Baca determined that there were

no significant changes to Plaintiff's job duties as a result of her reclassification and that she was not entitled to a different salary level. At her deposition, Plaintiff admitted that the change in job titles did not reflect a change in job duties:

> Q. So you did essentially the same thing when you went from Research Coordinator to Project Director?
>
> A. Right.

Plaintiff's Dep., p. 110.

It is apparent from the record that Plaintiff was disappointed and upset that she did not receive the 33% salary increase she had requested and had been led to expect by Dr. Tobin. The remaining time of her employment with the University was marked by persistent efforts to revisit the "unresolved question" of her salary increase, which were met with persistent responses that the issue was resolved and that she was not entitled to the increase. Plaintiff insisted that she was entitled to the salary because it was approved in the NIH grant. The University insisted that salary levels were set by University policy based on the job classification and were not dictated by the source of funding. In an April 30, 2003 email to Diane Baca, Dr. Tobin wrote to request a meeting to discuss Plaintiff's salary further:

> An issue yet unresolved is the 2003-2004 position title and compensation package for Kimberly Welch. Her salary and benefits are paid fully through NIH grant 4-20753 for the next two years.

Plaintiff's Dep. (Doc. 36), Ex 12, P-0208. The same day, Baca wrote in response:

> Brian, I don't believe we need a meeting. I believe that Cheryl [Reagan] has been very clear in all of the policies related to this and the impact. Do you [*sic*] any new information you wish to share that I can review[?] If not, then the fact that no faculty and professional staff will be receiving pay increases will also apply to any grant funded or contract funded position.

Id., P-0210.  Federal guidelines governing the NIH grants required the University to pay its employees according to its standard compensation policies, regardless of what is listed in the grant progress report.  Reagan Dec. (Doc. 32, Ex. 1), ¶ 14; Lenz Dec. (Doc. 33, Ex. 4), ¶¶ 7-8.  Dr. Tobin responded to Baca's email by continuing to press for a meeting.  The record does not indicate that any further meeting took place.

In August of 2003 Plaintiff became concerned that money from the NCVD grant was being used to pay another professor in the Basic Science Department, Dr. Peter Uchaikin.  Plaintiff's Dep. (Doc. 36), p. 171.  Dr. Uchaikin had done some work to assist on the project after the death of Dr. Colleen Smith in 2002, but he had never been officially added to the grant.  Plaintiff reported her concerns about "misappropriation" of grant funds by Dr. Uchaikin to various administrators, including Cheryl Reagan and Lavonda Peavy, a bookkeeper in the accounting department.  Id. at 169.  Plaintiff met with Reagan about her concerns, and Reagan initially confirmed that Dr. Uchaikin had been allocated some funds from the grant.  Later, in a September 3, 2003 email to Plaintiff, Reagan explained that she had relied on erroneous information in that earlier meeting and that she had determined on further review that Dr. Uchaikin did not in fact receive any allocation from the grant.  Id., Ex. 18.  Plaintiff did not accept this explanation and still believes that Dr. Uchaikin received funds from the grant in 2003.  In 2004, after Plaintiff took medical leave, Dr. Uchaikin was officially added to the grant, partly to perform duties that Plaintiff had performed.

Plaintiff began her medical leave on September 16, 2003, by notifying Diane Baca that she intended to take a leave of absence under the University's Family and Medical Leave Act policy.  She remained on medical leave for twelve months.  The nature of her health problems was psychiatric, and her request for medical leave was supported by a certification from her psychiatrist

that described "Depression with crying spells, obsessional wory [*sic*], [increased] insomnia, [decreased] appetite & concentration, anhedonia, [and] panic attacks." Plaintiff's Response (Doc. 46), Ex. 3. Plaintiff has testified that she was prompted to seek psychiatric treatment "[b]ecause of experiencing anxiety, breathing difficulty, and stress" arising from "[t]he incident with my salary issue." Plaintiff's Dep. (Doc. 36), p. 143. She remained on paid leave for seven months, followed by five months of unpaid leave.[2] In her declaration, Baca states that only she and Rhonda Lidstone in the Human Resources Department were aware of the reasons for Plaintiff's medical leave. Dr. Tobin states in his declaration that he was unaware of the nature of Plaintiff's medical condition. Plaintiff's deposition testimony confirms that Plaintiff only informed Baca and Lidstone of the reason for her medical leave. Plainitff's Dep. (Doc. 36), p. 249.

While on medical leave, Plaintiff continued to press for reconsideration of her salary. On February 4, 2004, Plaintiff wrote to Diane Baca to raise the "unresolved" issue of her requested salary increase. Her letter suggests that her mental health and return to work would be contingent upon a satisfactory resolution of her salary request. She writes:

> I have been instructed by my physician to write this letter to you to request information that will hopefully ease my transition back to work. My estimated return date is Feb 16, 2004. My physician recommends that I have the opportunity to discuss your responses with him prior to my return to work. My next appointment is scheduled for Wed. Feb. 11, 2004, which is also the time my physician is scheduled to update the "Certification of Health Care Provider" form for my file. If at all possible, could you please remit your responses by my next doctor's appointment so that he can better estimate my return date (per my physician's request)?

---

[2]The University's FMLA policy allowed for long-term employees to take a medical leave of absence of up to one year. Employees on medical leave were required to use accrued sick leave and vacation time prior to taking unpaid FMLA leave. Plaintiff had 33 days of accrued vacation time and 46.75 days of accrued sick leave. In addition, the University granted Plaintiff twelve weeks of paid FMLA leave, for reasons that are not entirely clear.

I would like these issues/questions addressed in hopes <u>to minimize work-related stress upon my return</u>. Additionally, I'd like to request full discretion in obtaining relevant information to honor my privacy and confidentiality, as noted by HIPAA. My concerns are as follows:

. . .

<u>Second</u>

I believe you are familiar with my salary issue that was unresolved prior to my family medical leave. If this issue remains unresolved please address the following – if this issue was resolved in my absence, what were the changes?

The total 2003 grant funds designated for my salary were not granted to me due to several reasons, which will not address at this time. Considering:

1 – Brian Tobin's justification letter for my salary increase (originally dated Sept. 10, 2003, later modified and sent to MUSM Finance c/o Sharon Hall)

2 – My change in duties (as I took on the duties of Dr. Colleen Smith, deceased, and others)

3 – My position upgrade from Research Coordinator to Project Director <u>with instructor role</u> (see PDQ)

4 – Others (I know personally) that have less credentials as I, and some that have equal credentials as I – with similar job categories and duties assigned to me.

5 – . . . and much, much more I believe there is a proper resolution to my salary issues.

I understand the raises approved for fiscal year 2003 (this present fiscal year) involved position upgrades just as I received (University Finance documented September 5, 2003). I was informed that similar salary issues in Community Med. were resolved around the same time (documented communication w/ Marie Dent). For these reasons and many others, I feel that I have not been treated fairly nor equally as others. With your role as MU Equal Opportunity Coordinator, I believe you can assist me in resolving my salary issue.

. . .

I feel that these answers and problem resolutions are critical for managing my medical condition. I have thoroughly discussed this letter with my physician and <u>he feels that it is equally important to resolve these issues for the benefit of my health</u>.

Plaintiff's Dep. (Doc. 36), Ex. 14 (emphasis in original). Baca responded with a February 10, 2004

letter explaining, once again, that Plaintiff was not eligible for a salary increase. Baca writes:

To my knowledge, and from my standpoint and that of the Medical School Administration, there is no unresolved issue regarding your salary. I have no PDQ that states that you are an instructor. The issue of the level of grant funding versus

what you are receiving was settled in September 2002. Salary policies of the University are not set by grant funding levels. We have acted consistently across the University in this matter. We had many grants that had increases in them in 2003, but the professional/administrative personnel so funded were not provided salary increases based on the fact that professional/administrative personnel salaries were held flat in this current fiscal year.

Further, I have no letter in your file dated September 10, 2003, nor do I have a PDQ that indicates you have an instructor role. Faculty appointments are recommended through the chair of the department, to the Dean with the ultimate appointment being made by the President of the University. Your classification at the University is not faculty, but as a professional/administrative employee.

Plaintiff's Dep. (Doc. 36), Ex. 1.

Plaintiff did not return to work on February 16, 2004, as originally suggested, but remained on medical leave until September 20, 2004. Immediately upon her return to work, she renewed her demands for the salary increase. On her second day back at work, she presented Dr. Tobin with a note saying she needed to discuss "unfinished business." Plaintiff's Dep. (Doc. 36), Ex. 21. This unfinished business was once again her request for a salary increase. Plaintiff's Dep. (Doc. 36), p. 242. Dr. Tobin scheduled a meeting with Plaintiff for 11:00 a.m. on Friday, September 24. Rhonda Lidstone, the University's Director of Human Resources Services/Affirmative Action, was also invited to attend.

Dr. Tobin had business of his own at the September 24 meeting. He wanted to discuss his concerns about Plaintiff's performance on her return to work and his expectations for Plaintiff in the final months of the NCVD project. In the first four days after her return from medical leave, Plaintiff was not in the office for a single full day of work. On Tuesday she had a doctor's appointment. On Wednesday and Thursday, she has testified, she left the office early because she was having complications breathing the office air and could not find an air purifier that she had previously used. Plaintiff's Dep. (Doc. 36), p. 245. Before taking her medical leave, Plaintiff had

been allowed to do some work from home. She contends that on Wednesday and Thursday of her first week she took home training materials on HIPAA and IRB that Dr. Tobin had requested her to complete. By Friday, however, she had yet to complete the training. At the September 24 meeting, Dr. Tobin asked Plaintiff why she had been absent from work and why she had not completed the training. Plaintiff explained that she had not completed the assignments because she was having computer difficulties. She also stated that she had been allowed to do some work from home, prior to her medical leave. Dr. Tobin in response explained that because the NCVD project was coming to an end, he expected her to be in the office and could no longer allow her to work from home. Later in the day he gave Plaintiff a written memorandum outlining his expectations. Plaintiff's Dep. (Doc. 36), Ex. 20. When Dr. Tobin had finished laying out his concerns and expectations at the meeting, Plaintiff again pressed for her requested salary increase and argued her concerns about work done by Dr. Uchaikin. Lidstone and Baca asked Plaintiff to meet with them in the Human Resources Office so that they could explain the University's position one more time, but Plaintiff refused to meet with them. Later that afternoon the three spoke by telephone instead.

The following week, Dr. Tobin found that Plaintiff was again leaving the office early. Dr. Tobin was out of town during the week of September 27, 2004. At approximately 2:30 in the afternoon on Thursday, September 30, 2004, he attempted to call Plaintiff, but she did not answer her telephone. He then left a message with his assistant, Earnestine Waters, who put a note on Plaintiff's computer screen directing her to call Dr. Tobin on his mobile phone. Plaintiff never returned the call. Waters states in her declaration that she did not see Plaintiff in the office on Thursday afternoon and that the message was still on Plaintiff's computer screen the following

morning.  Waters Dec. (Doc. 33), ¶¶ 14-15.  Waters also states that Plaintiff left the office at noon on Friday and did not return for the rest of the day.  Waters Dec. (Doc. 33), ¶ 16.

Plaintiff does not dispute that she was out of the office on Thursday afternoon, September 30, and Friday afternoon, October 1.  On October 1, Plaintiff was still preoccupied with her requested salary increase.  She met with Rhonda Lidstone that morning to discuss, yet again, her PDQ and her status as an instructor.  Plaintiff's Dep. (Doc. 36), Ex. 1, P-0698.  Later that day Plaintiff went to meet with Jane Simpson at the Georgia Department of Labor to file a claim of discrimination related to her salary.  Plaintiff's Dep. (Doc. 36), p. 276; Ex. 1, P-0698.  In her deposition, Plaintiff initially testified that her trip to the Department of Labor took place "outside of my work time," but later conceded that the Department of Labor likely closed at five o'clock and that it was possible she took time off work to go there.  Plaintiff's Dep. (Doc. 36), p. 276.

The following week Dr. Tobin met with Plaintiff to discuss her progress on the tasks and requirements outlined in the September 24 memorandum.  The parties dispute both the date and the substance of this meeting.  In his Declaration, Dr. Tobin states that he met with Plaintiff on Monday, October 4, to discuss his "serious concerns" about her failure to complete her assigned tasks and her continued absences from work.  Although Plaintiff did not testify regarding the meeting in her deposition, and has submitted no affidavit or evidence regarding the meeting in her response to the Motion for Summary Judgment, her memorandum to the EEOC states that she met with Dr. Tobin on October 5, and that Dr. Tobin told her all of her work and reports were fine.  Plaintiff's Dep. (Doc. 36), Ex. 1, P-0698.

Plaintiff was finally discharged from her employment on October 7, 2004.  Plaintiff suggests that her termination was motivated by an email she sent to Rhonda Lidstone arguing, yet again,

about her sense of entitlement to a pay increase. See, Plaintiff's Dep. (Doc. 36), Ex. 1, P-0701. The

email shows that it was sent at 10:59 a.m. on October 7. Dr. Tobin states in his declaration that he

made the decision to fire Plaintiff after consulting with Lidstone and two attorneys for the

University. Dr. Tobin and Lidstone met with Plaintiff in the afternoon and presented her with a

termination letter outlining the reasons for her discharge. In that letter Dr. Tobin writes:

> Almost 3 weeks ago, I welcomed you back to Mercer. I anticipated having you back as an engaged productive contributor. From the day you started, however, you have failed to engage and perform at a level expected of a Research Coordinator. I met with you on September 24 to clarify my expectations for your performance, which I communicated to you in the form of a memo, [*sic*] you have failed to meet those performance objectives and you have failed to perform at the expected level.

> Specifically, despite my request that you notify me in advance prior to your leaving the office, on multiple occasions you left work without giving me notice. When I left instructions for you to call me, you failed to communicate with me by returning phone calls. You have also failed to accomplish the very specific objectives that I outlined in the September 24th letter to you. Instead of accomplishing the tasks that you were assigned, you have exhibited behavior that has been perceived by myself and other professionals to be detrimental to a productive working environment.

> Because of these factors, I have made the decision to terminate your employment effective immediately. You will be compensated for two weeks' pay in lieu of notice.

Plaintiff's Dep. (Doc. 36), Ex. 25.

At the conclusion of her meeting with Dr. Tobin and Lidstone, Plaintiff experienced an

apparent mental breakdown. Lidstone presented Plaintiff with a separation notice and a notice of

COBRA rights. Plaintiff was asked to sign the COBRA notice, but she refused to do so. Instead,

she asked to be excused and went to the women's room across the hall. Dr. Tobin and Lidstone

were waiting for her when she came out of the women's room. Dr. Tobin demanded that Plaintiff

return her office keys. Plaintiff did not respond, but walked across the hall towards an entrance to

the faculty office area. She has testified that as she opened the door to the faculty office area Dr. Tobin "put his hands on [her]." Plaintiff's Dep. (Doc. 36), p. 302. Plaintiff's testimony as to the nature of Dr. Tobin's contact with her is not clear. In her deposition she suggests that he was trying to turn her around to return to the conference room. Plaintiff's Dep. (Doc. 36), p. 311-12. In a later statement to the police, she stated that Dr. Tobin put his hand on her upper arm or shoulder. Response to Motion for Summary Judgment (Doc. 46), Ex. 1, p. 7. When Dr. Tobin touched her, Plaintiff began to scream and continued screaming as she fell to the floor. The screaming fit continued until paramedics were called to take Plaintiff to the hospital, where she was kept overnight before being sent to a psychiatric facility for five days. On October 25, 2004, Plaintiff filed a complaint with the Mercer Police, including a nine-page written statement that recounts in detail her grievances concerning her salary and the NIH grant.

## III.    Conclusions of Law

The record of evidence outlined above lacks evidence sufficient to create a genuine issue of material fact as to Plaintiff's claims of race and disability discrimination. As to racial discrimination, Plaintiff contends that she was paid less than white employees and was discharged because of her race. As to disability discrimination, it is very difficult to determine the precise nature of Plaintiff's claims. She appears to contend that Dr. Tobin's decision to require her to work at the office after her return from medical leave was somehow discriminatory. Neither of these claims is supported by evidence that would allow a reasonable jury to find in Plaintiff's favor.

### A.    Race Discrimination

In a race discrimination case under Title VII, the fundamental element that a plaintiff must prove is that the employer's adverse actions were motivated by animus against the employee's race.

"Title VII prohibits an employer from 'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (citing 42 U.S.C. § 2000e-2(a)(1)). "A plaintiff in a Title VII action may attempt to show this discrimination by offering either direct or circumstantial evidence." Id. (citation omitted).

Direct evidence of discrimination is evidence, that, 'if believed, proves the existence of a fact in issue without inference or presumption.'" Vickers v. Federal Express Corp., 132 F. Supp.2d 1371, 1378 (S.D. Fla. 2000). Such evidence is generally comprised of specific statements, conduct or attitudes by employment decision makers that show an intent to discriminate in making the employment decision in question. Plaintiff has presented no evidence of any statements or other conduct by any of Defendant's agents that indicated Plaintiff failed to receive the promotion she requested or was discharged because she is black, nor is there any evidence in the record that could be construed as direct evidence of discrimination.

Because direct evidence of discriminatory intent is rare and difficult to come by, courts have developed a framework for proof of discrimination by circumstantial evidence. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Within that burden-shifting framework, it is initially a plaintiff's burden to create an inference of discrimination by evidence establishing a *prima facie* case of discrimination. Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1162 (11th Cir. 2006). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to present evidence to show that its decision was based on a legitimate, non-discriminatory reason. Id. Finally, if the defendant employer presents legitimate, non-discriminatory reasons, the burden shifts again to the plaintiff to

show that these proffered reasons are really a pretext for discrimination. Id. "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." Id. (quoting EEOC v. Joe's Stone Crab, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)).

### 1. Equal Pay

Plaintiff's "equal pay" claim may be characterized as a claim for denial of a promotion or for disparate pay on the basis of race.[3] The salary that Plaintiff sought, $45,514, was a salary for a faculty-level Instructor position. Plaintiff requested to be made an Instructor, but her request was denied. To prove a *prima facie* case of race discrimination for failure to promote, Plaintiff must show (1) that she is a member of a protected class, (2) that she was qualified for the position, (3) that she was rejected, and (4) that other equally or less qualified employees who were not members of her protected class were promoted. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). Alternatively, Plaintiff may prove a *prima facie* case of discrimination in her pay by showing (1) that she is a member of a protected class, (2) that she received a low salary, (3) that similarly situated comparators outside the protected class received higher salaries, and (4) that she was qualified to receive the higher salary. Cooper v. Southern Co., 390 F.3d 695, 734-35 (11th Cir. 2004). Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact under either framework because the undisputed evidence shows that she was not qualified for the promotion she sought and because she has failed to present evidence that other, similarly-situated employees received more favorable treatment.

---

[3]The Equal Pay Act, 29 U.S.C. § 206(d)(1), applies only to pay discrimination on the basis of sex.

Within the framework of a failure to promote claim, Plaintiff has failed to present evidence sufficient to allow a reasonable jury to find that she was qualified for the position she sought or that other equally or less qualified employees outside her class were promoted. Plaintiff, who is black, is a member of a protected class. It is undisputed that she applied for a promotion to the faculty-level position of Program Director/Instructor and that her application was denied. It is also beyond dispute, however, that she was not qualified for the promotion. Defendant has presented evidence to show that faculty members in the Basic Science Department were required to have a doctoral degree, either a Ph.D. or an M.D. Plaintiff only had a master's degree.

Plaintiff contests Defendant's evidence that a doctoral degree was a qualification for the position she sought, but has failed to present sufficient evidence to create a genuine issue of material fact. She points to two Instructors in the Department of Community Medicine, Kathryn Martin and Frances Carter, who did not have doctoral degrees but had only master's degrees. Because these two Instructors were in a different department with different qualifications for its faculty members, evidence as to their qualifications is not relevant to the question of qualifications for an Instructor in Basic Science. Defendant has offered unrebutted evidence that the head of each Department at the University has authority to set the standards for hiring faculty members. See Moon Dec. (Doc. 34), ¶ 4. The head of the Basic Science Department, Dr. Moon, informed Plaintiff at the January 29, 2003 meeting that she was not qualified for a faculty position in the Department. The fact that the Department of Community Medicine had different standards for its faculty members has no relevance to the qualifications for the position that Plaintiff sought.

Plaintiff has also failed to present evidence that someone from outside her protected class received the promotion that she sought. Nobody was given the position of Program

18

Director/Instructor in Basic Science that Plaintiff had sought to create for herself. There is no evidence that the position was kept open or that the Department continued to seek someone to fill the position, because the position was never open in the first place. The Basic Science Department had no Instructors on its faculty and had never sought to hire an Instructor. Moon Dec. (Doc. 34), ¶ 11.

Within the framework of a disparate treatment claim on the basis of unequal pay, Plaintiff has failed to present sufficient evidence to show that other similarly situated employees from outside her class received more favorable treatment. Plaintiff contends that even as a non-faculty Project Director she was entitled to the pay raise that she sought in her initial request for reclassification. She offers Kathryn Martin and Frances Carter in the Department of Community Medicine as comparators, claiming that they were similarly situated and received higher pay. As an initial matter, there is no evidence in the record to show that these two instructors received higher pay than Plaintiff. There is no evidence at all as to what they were paid. In her Response brief, Plaintiff states that Kathryn Martin was paid approximately $45,000 in 2003-2004. The source she cites for this proposition is a "verbal communication with Ike Okosun." Response (Doc. 46), p. 7. This statement is pure hearsay, and there is no evidence as to this statement anywhere in the record before this Court. Plaintiff's brief goes on to say that Ms. Martin made $63,036 in 2004-2005. This proposition is supported by a citation to the "Mercer University 2004-2005 Budget Personnel Detail." Id. This document is not otherwise identified and appears nowhere in the record of the case. As to the other proposed comparator, Frances Carter, there is no evidence outside the contention in Plaintiff's Second Response to Defendant's Interrogatories (Plaintiff's Dep. (Doc. 36), Ex. 24, p. 19-20) that Ms. Carter earned $50,000. Plaintiff's bald allegations as to the pay that these

employees received are unsupported by any admissible documentary evidence or testimony and do not create a genuine issue of material fact.

Although there is no evidence in the record to show what Martin and Carter were paid, there is undisputed evidence that shows they are not similarly situated to Plaintiff. Employees are similarly situated if they perform "the same type of tasks" as Plaintiff. Cooper, 390 F.3d at 735. Plaintiff must establish that these employees are "similarly situated in all relevant respects." Sumerlin v. AmSouth Bank, 242 Fed. Appx. 687, 690 (11th Cir. 2007) (quoting Wilson v. B/E Aerospace, 376 F.3d at 1085). "The comparator employee 'must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" Id.

Plaintiff has failed to present any evidence as to the nature of work performed by Martin and Carter. In her deposition she attempts to establish that she had duties similar to a faculty-level instructor through testimony that she administered programs for students and community members on topics such as weight management and glucose tolerance testing. Plaintiff's Dep. (Doc. 36), p. 98-99. These programs were intermittent, and Plaintiff did not teach courses for credit or administer grades to students. Id. at 95-100, 253-54. Evidence submitted by Defendant shows that Martin and Carter were faculty-level Instructors in another department. Baca Dec. (Doc. 31), ¶ 38. Carter was the assistant director of the Masters of Public Health program in the Community Medicine. Id. There is no evidence in the record as to their specific duties or as to the nature or number of courses they taught. The evidence that exists is insufficient to show that they are sufficiently similar to Plaintiff for purposes of comparison.

## 2. Discharge

Although Plaintiff's Response to the Motion for Summary Judgment does not present an argument that Plaintiff was discharged because of her race, her *pro se* complaint can be construed to state a claim for race discrimination arising from the termination of her employment. To the extent that it does, such claim is subject to summary judgment. Ordinarily, to establish a *prima facie* case of discriminatory discharge a plaintiff must present evidence that similarly situated employees were not discharged. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). There is no evidence of a similarly situated employee who was treated more favorably in this case. In the absence of such a similarly situated employee, Plaintiff must present some other evidence that the discharge was racially motivated. Id. The Court is aware of no such evidence in this case.

The evidence that is in the record shows that Defendant had a legitimate, non-discriminatory reason for its decision to discharge Plaintiff. The termination letter that Dr. Tobin presented Plaintiff at the October 7, 2004 meeting outlined three reasons for his decision to terminate her employment. First, Plaintiff was consistently absent from work in her first three weeks back from medical leave, even after she was counseled at her September 24, 2004 meeting with Dr. Tobin that she was required to be in the office and could no longer work from home. Second, Plaintiff failed to accomplish specific tasks outlined at the September 24 meeting. Third, Plaintiff exhibited a bad attitude that was not conducive to a productive work environment.

There is ample evidence in the record to support Dr. Tobin's claims. With regard to the absences, Dr. Tobin and his assistant, Earnestine Waters, have testified that Plaintiff left the office early on four of her first five days back at work, and left early two days the second week, on Thursday, September 30 and Friday, October 1. Plaintiff has admitted that she left for a doctor's

appointment one day during the first week and left early at least two other days that week to work from home.  She has also admitted that she went to the Georgia Department of Labor on Friday, October 1, and has conceded that this could have happened during office hours, as the Department of Labor generally closes at five o'clock.  As for Thursday, September 30, she has failed to offer any explanation for failing to return Dr. Tobin's telephone call and does not recall receiving the message.  Plaintiff's Dep. (Doc. 36), p. 246-47.  Dr. Tobin states in his declaration that she told him she did not return his call because she did not want to disturb him on his trip.  Tobin Dec. (Doc. 28, Ex. 1) (Doc. 28, Ex. 1), ¶ 47.  He did not consider this explanation to be acceptable.

With regard to her failure to complete assigned tasks, Plaintiff concedes that as of the September 24, 2004 meeting with Dr. Tobin she had not yet completed the HIPAA and IRB training and testing that was given to her on her first day back at work.  She explained to Dr. Tobin that her failure was due to computer problems.  At her deposition she testified she could not recall when she finally completed these tasks.  Plaintiff's Dep. (Doc. 36), p. 232.  Plaintiff's Statement of Material Facts (Doc. 47), at paragraph 67, states that she completed the training on September 27 or 28, but this statement of fact is supported only by reference to a document that is not in the record.  Dr. Tobin states in his declaration that Plaintiff told him on October 4 that she needed an active email address to complete the tests, but then claimed that she had completed the tests on September 28 and 29.  Tobin Dec. (Doc. 28, Ex. 1) (Doc. 28, Ex. 1), ¶ 47.  Plaintiff also concedes that she had failed to complete work assignments related to survey data because of computer problems and difficulties communicating with former employees.  Plaintiff's Dep. (Doc. 36), pp. 235-36.

Finally, with regard to her attitude problems, there is ample evidence in the record to corroborate Dr. Tobin's concern about Plaintiff's negative attitude on her return to work in

September 2004. Tobin Dec. (Doc. 28, Ex. 1) (Doc. 28, Ex. 1), ¶ 51. It is apparent from Plaintiff's own testimony and documents in the file that Plaintiff continued her obsession with the "unfinished business" of her request for a salary increase, which she raised at every opportunity. One such instance was at the meeting of September 24. Plaintiff's Dep. (Doc. 36), p. 244-45. Following the meeting, Rhonda Lidstone and Diane Baca called Plaintiff to explain to her once again the reasons she was not entitled to a salary increase. They were forced to discuss the matter by telephone because Plaintiff had refused to meet with them in their office. Lidstone and Baca both state in their declarations that during their telephone conversation Plaintiff stated that she would not do her job if she was not paid the salary she wanted. Baca Dec. (Doc. 31), ¶ 36; Lidstone Dec. (Doc. 32), ¶ 18. Plaintiff has not submitted any evidence to rebut this testimony.

Additional evidence of Plaintiff's attitude comes from a conversation between Dr. Tobin and Dr. John Boltri, Professor of Family Medicine. Dr. Tobin's declaration describes a conversation with Dr. Boltri that took place on October 5, 2004, two days before Plaintiff was discharged. Shortly after Plaintiff returned from her medical leave, Dr. Tobin had approached Dr. Boltri to discuss finding a position for Plaintiff on Dr. Boltri's research team at the Family Health Center. Tobin Dec. (Doc. 28, Ex. 1) (Doc. 28, Ex. 1), ¶ 38. Dr. Tobin was concerned that the NCVD grant was set to expire in the Spring of 2005, leaving Plaintiff without a job. Id., ¶ 37. He spoke with Dr. Boltri again on October 5.[4] Dr. Boltri informed Dr. Tobin that he had spoken with Plaintiff about her position and that she had told him she thought she had been treated unfairly. She further stated

---

[4] Dr. Tobin's conversation with Dr. Boltri is set forth in Dr. Tobin's Declaration. Although there is no declaration from Dr. Boltri to establish the truth of his reported conversation with Plaintiff, Dr. Tobin's testimony as to Dr. Boltri's statements would likely be admissible not as evidence of the matter asserted, but as evidence of Dr. Tobin's state of mind and intention in discharging Plaintiff, which is a key issue in the case.

that she intended to leave the Basic Science Department and never work for the University again. Id., ¶ 50. This conversation appears to have cemented Dr. Tobin's decision to discharge Plaintiff.

Taken together, Defendant's evidence regarding Plaintiff's behavior after her return from medical leave provides ample support for its claim that it had a legitimate, non-discriminatory reason to terminate Plaintiff's employment. Plaintiff has offered excuses for her absences and her poor performance, but she has offered nothing to challenge the credibility of Defendant's reasons or to suggest that these reasons were a pretext for discrimination.

### B.        Disability Discrimination

Plaintiff's discrimination claim under the Americans with Disabilities Act is subject to summary judgment because Plaintiff has failed to present evidence sufficient to support a *prima facie* case of disability discrimination in violation of the ADA. To prove a *prima facie* case Plaintiff must show that "(1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). Her claim fails because there is no evidence that Plaintiff had a disability or that she suffered any adverse employment action as a result of a perceived disability. Plaintiff has never specifically identified her alleged disability, but suggests that it is somehow related to the mental health issues that led to her 12-month medical leave. As an adverse employment action, Plaintiff refers to the September 24, 2004 memorandum from Dr. Tobin outlining his expectations upon Plaintiff's return to work. Plaintiff contends that this memorandum imposed "new rules" on her because of her disability. Response (Doc. 46), p. 15. She primarily complains that she was no longer allowed to work from home.

Plaintiff has not presented evidence that would permit a reasonable jury to find she has a disability as defined by the ADA. The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff's Response never specifically identifies her disability, but alludes to the mental condition that led her to take medical leave for a year. The closest her brief comes to identifying the disability is in the statement, "Plaintiff had a recognizable disability as demonstrated from her record. (Exhibit C Certification of Health Care Provider, U.S. Dept. Of Labor)." Response (Doc. 46), p. 15. The Exhibit C to which Plaintiff refers is a series of Certification forms from Plaintiff's physician to support her medical leave, all of which describe her as having depression, insomnia, increased appetite, decreased concentration, anhedonia, obsessional worry, and panic attacks. In the last of these forms, Plaintiff's physician writes that as of September 20, 2004, Plaintiff can return to full time work and is able to perform all the essential tasks of her job.

Plaintiff has failed to show that her depression and related mental health problems substantially limited a major life activity. In evaluating a claim of disability, a court must be able to identify the specific life activities that have been limited by a disability and determine whether they are "major life activities." Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004). The court must then be able to evaluate whether the alleged impairment "substantially limits" that life activity. Id. Plaintiff has failed to provide even the bare minimum of information necessary to make such an evaluation. She has presented neither evidence nor argument to explain the precise nature of her alleged disability. There is no affidavit or deposition from her physician to explain how her emotional or mental difficulties impacted her life. Plaintiff's own deposition testimony

contains numerous references to her mental health problems, but none are specific enough to allow the Court or a finder of fact to identify a specific life activity that was limited by her condition or to determine whether such a life activity was substantially limited. In short, Plaintiff has "failed to specify a major life activity in which she is substantially limited, nor has she provided any evidence of such a limitation." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000). She has also failed to provide any evidence of a record of such an impairment.

There is also no evidence of a perception of disability. The record shows that Dr. Tobin was not even aware of the reason for Plaintiff's twelve-month leave. Tobin Dec. (Doc. 28, Ex. 1)(Doc. 28, Ex. 1), ¶ 33. Plaintiff was scrupulous about her privacy rights and informed only Diane Baca and Rhonda Lidstone about the reason for her medical leave. Plaintiff's Dep. (Doc. 36), p. 249. As far as Lidstone and Baca were aware, after twelve months of rest and relaxation and after being released by her physician for full-time work without limitations, Plaintiff was no longer suffering from any impairment when she returned from her leave. Baca Dec. (Doc. 31), ¶ 33; Lidstone Dec. (Doc. 32), ¶ 15.

To the extent Plaintiff's mental condition could be considered a "disability" for ADA purposes, there is no evidence that she suffered an adverse employment action because of it. Dr. Tobin's September 24, 2004 memorandum is not an adverse employment action. It simply outlines the tasks that Plaintiff was expected to pursue. None of these tasks is especially onerous. Plaintiff seems to be most offended that she was required to come to the office and would not be allowed to come and go as she pleased and work from home when she felt like it. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change

in benefits." <u>Brown v. Snow</u>, 440 F.3d 1259, 1265 (11th Cir. 2006). Being required to show up for work is not an adverse employment action.

Plaintiff has not specifically contended that her discharge was the result of discrimination on the basis of disability, and there is no evidence of any causal link between her discharge and any real or perceived disability. As noted above, Defendant has provided substantial undisputed evidence of its legitimate and non-discriminatory reasons for terminating her employment.

## III.   Conclusion

Plaintiff has failed to meet her burden of demonstrating the existence of a genuine issue of material fact, in that she has failed to show any direct or circumstantial evidence of discriminatory intent on behalf of anyone at the University. It is clear that Plaintiff was deeply disappointed at the denial of her request for a salary increase. Her disappointment is understandable, given that her supervising professor had given her reason to believe that she would be entitled to receive an increase in pay of greater than thirty-three percent. It was, unfortunately, not his decision to make. The bureaucratic rules of the University did not authorize such a salary increase. Plaintiff may have perceived this unexpected denial of her request to have been unfair, but unfairness does not equal racial discrimination. There is no evidence in this case that the University's decision had anything to do with Plaintiff's race or with any perceived disability. Accordingly, the Motion for Summary Judgment is granted, and the Clerk of Court is directed to enter judgment in favor of Defendant as to all claims, with costs.

**SO ORDERED**, this 2nd day of May, 2008.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE